Your Honors, and may it please the Court, my name is Randy Fiedler, and I'm here on behalf of Andrei Raileanu. I would like to reserve two minutes for rebuttal. Okay. Keep your eye on the clock. It counts down. Thank you. On January 13, 2013, Officer Bundy had no calls for service, and so he was being actively proactive. This meant that when he saw a black Mercedes driving west on Mesquite Boulevard, he decided to follow it. And what city are we in? Mesquite, Nevada. Counsel? Go ahead. This room is really echoey because of the marble. So, yeah, it's not a problem with volume, but if you could speak a little slower, it helps me to understand. Okay. Thank you. Is this better? Yeah, it's just fine. It just bounces around. It's a funny sound. Officer Bundy eventually stops this black Mercedes on the basis of three facts. First, he sees the Mercedes pull into a gas station, and then after he drives around the block, he sees the petitioner, Mr. Raileanu, standing on the corner of the building looking at him for three seconds. And then when Mr. Raileanu gets back on the highway, he sees the black Mercedes touch the white fog lines on the side of the highway three times. May I ask a question about that? Yes, please. When you said he saw the defendant standing on the corner looking at him for three seconds, the record indicates a little bit more than that, I think, and I want to make sure I've got it right. I understood that he reported that the or recalled that the defendant was sort of peeking around a corner. Is that right? That is how he describes it, but he also explains that Mr. Raileanu was standing on the corner and the amount of time that he was kind of looking at Officer Bundy was about three seconds. So here's my problem. Standing on the corner I think means standing on a street corner, but peeking around a corner makes it sound like the individual was positioned right next to a building. Which was it? My understanding of the record is that he was positioned next to the building. I think it was Officer Bundy's testimony indicated that he was standing about 20 feet away from the door. And I think either during direct or cross Officer Bundy testified that he was standing sort of I think there was clarification about him standing on the corner of the building. Thank you. Do we have any evidence that tells us how much time elapsed between the time the black Mercedes pulls into the gas station and Officer Bundy sees your client looking around the corner or peeking around the corner or standing around the corner? He says that he's driving around the corner for about a minute. So his testimony was that he does his U-turn and he sees that the black Mercedes is already pulling into the gas station. And as he drives by, the black Mercedes is already parked at the gas station. The gas station is right on the corner. So he then drives to the next corner, laps the block, and then he sees Mr. Raileanu standing on the corner. And he says that driving around the block takes about a minute. So one may possibly infer from that that your client did not, in fact, get any gas at the gas station. He gets out of the car and he comes to look around at the corner instead of getting into the gas station and putting gas on the car. That is correct. And, in fact, he also parked at the side of the building. So he didn't even park at one of the gas terminals. However, there was testimony that came out during his girlfriend's direct examination indicating that they were kind of lost and that they had pulled into this gas station just so that he could get food. Now, Officer Bundy, when he pulls across the street after he laps the block, he pulls across the street and pulls into this parking lot where he can see the gas station. He can see the entrance and the exit of the gas station, but he can't see Mr. Raileanu or the inside of the gas station. So he doesn't see what Mr. Raileanu is doing while he's waiting at this trailer park across the street. Right. But so if the testimony is truthful that they adopted the gas station to get food, it still doesn't sound as though, given the time it would have taken to drive around the block for Officer Bundy, that he would have gone in, gotten food, and come back out again. It sounds as though he got out of the car and came to the corner and then we had that exchange of looks. That sounds accurate. There's nothing to indicate he went into the gas station first. Excuse me. I couldn't hear that. There's nothing to what? Indicate that he went into the gas station before he went to the corner to look around. His girlfriend's testimony is that she said she didn't want any food. So I understood he didn't go get any food, in fact. Is that right? That's correct. Okay. Thank you. But her testimony was also that he went in, looked at what the options were, came back out, reported to her, and then she indicated that she did not want any of the food. The other aspect of this looking around episode is that Mesquite, this particular exit that he would have been getting off of on the I-15 has this roundabout that's somewhat complicated. There are multiple exits, and as you're getting to the roundabout, you have to kind of pay attention to the signs to know where you're turning off. And the trial attorney, during the cross-examination of Officer Bundy, sort of asked, like, isn't it possible that he was looking at this road next to the gas station to see whether it would connect up with the I-15. And given how close the I-15 is and the fact that the I-15 at that part kind of runs parallel to Mesquite Boulevard, it's not an unreasonable thing for Mr. Raylianu to have been doing, particularly given that his girlfriend testifies that they were having trouble with the GPS, they were trying to figure out where they were going. Can you describe what immediately precedes your client turning into the gas station? Because we had some testimony from Officer Bundy that he was already suspicious because of what preceded moving the black Mercedes turning into the gas station. Yes. Officer Bundy is driving eastbound on Mesquite Boulevard, and he's coming up to the same intersection where this gas station is. And he can see the black Mercedes approaching him because it's driving westbound. What he decides to do, because he's actively being proactive, is he decides he's going to pull a U-turn and sort of see what the black Mercedes is up to. Aside from the fact that he saw a black Mercedes, there was nothing for him to be suspicious about, although he sort of implied that at this point he had a hunch or something like that. So then he makes his U-turn, and as he's making his U-turn, he sees the Mercedes is already turning into the gas station. And by the time he's finished with his U-turn, the Mercedes is already into the gas station. From this, Officer Bundy infers that the Mercedes was avoiding him. However, the timing makes that difficult for Officer Bundy because it also supports that this black Mercedes was going to go to this gas station, and coincidentally, Officer Bundy made this U-turn. So by itself, it sounds as though if that's all the government has, they don't have enough. Correct. But nonetheless, that somehow arouses Officer Bundy's suspicion because he says in his experience when he follows somebody, they will sometimes, not wanting to be followed and wanting to somehow evade detection or whatever they're trying to evade, they will turn into a gas station or something. So it arouses his suspicion. Whether that by itself is enough is quite another question. And I would note two sort of aspects about how justified Officer Bundy was in having his suspicion aroused at this point. Mesquite is, the testimony shows, about 90 minutes from Las Vegas, and it's really the first stopping point between Las Vegas and St. George or Zion National Park or Bryce Canyon National Park. So it's very reasonable for people to pull off and go into the gas station. So as far as traffic maneuvers in Mesquite, Nevada, go, pulling into a gas station is fairly inane. The other aspect I would note about this as sort of nervous or evasive behavior is that cases in which drivers are engaging in nervous or evasive behavior in this court or the U.S. Supreme Court often describe substantially more evasive behavior, where someone's speeding up and then slowing down and then cutting a yellow light to avoid having somebody follow them through the red. At this point, I'd like to reserve the rest of my time for rebuttal, unless there are additional questions. You can have a chance to respond. Thank you. May it please the Court. Peter Levitt for the United States. Your Honor, Judge Fletcher is absolutely correct in asking a question that highlights the fundamental proposition that it's the totality of the circumstances filtered through the lens of the officer's training and experience that must be considered. In that regard, Mr. Levitt, one could look at this record, I think, and say perhaps under the precedence, the touching the white line might be in itself sufficient under Wren, perhaps, to justify a stop and maybe under a totality of the circumstances approach, as you just mentioned, everything that happened before the touching of the white line. But I'm having difficulty putting those two domains together. How does touching the white line contribute to the totality of the circumstances based on what the officer says was observed back at the gas station and before and thereafter? What's the logical connection that joins those two separate time periods? The logical connection, Your Honor, is that as Officer Bundy testified at the hearing, when he saw the defendant, after already having seen him peer around and quickly get off the road in response to being followed, when he saw the defendant swerve into and touch the fog line three times within a quarter-mile, Officer Bundy believed this is Clerk's Record 42 at page 12, that really, Your Honor, it was, quote, possibly looking out for me, which a part of the question is, what does touching the fog line have to do with looking out for a police officer? I'm just having difficulty making that logical leap or inference. Often. Was the notion that he was perhaps looking into the rearview mirror as opposed to the fog line? That is correct. That he believed that Grigliano might be intoxicated or, quote, looking in his rearview mirror knowing that I was following him. This is Clerk's Record 42 at 19 and 20, supplemental excerpts of Record at 6. And when all of these factors, he quickly gets off the road, then he's peering around the corner, then he sees the officer behind him, and he's swerving into the fog line, all of these three things come together to satisfy what this Court has characterized as the not particularly high threshold required for a vehicle stop. So could I ask, forgive me for interrupting, but I see your minutes ticking away. It is, of course, I appreciate the totality of the circumstances test, but you see the ball keeps moving. Initially, I think the police officer pulled this U-turn, it sounds like for no reason, on a hunch. Is that right? Just a black Mercedes sitting there. Not addressing the question of the strangeness of a black Mercedes in Mesquite, Nevada, Your Honor is correct. There's no particular basis for suspicion at that point. Okay. Then he sees the behavior that we talked about earlier right at the beginning of the argument about peering around the corner, and he finds that suspicious? Yes. All right. And then there's the — and at that point, do we know what he's suspicious about, or just it's suspicious that the man is peering around the corner? I believe, Your Honor, at that point, the officer's suspicion, which I'd note parenthetically, he's not constitutionally obligated to nail down the precise basis of his behavior. No, I appreciate that, but the answer is — isn't it the answer no? I don't think the record says what the police officer was suspicious about, because I'm with Judge Fletcher. I don't think it's suspicious just that there was a black Mercedes driving into the town. So I didn't see anything that justified. But anyway, the police officer did what he did. He pulled the U-turn. Then he sees the peering around the corner. Correct. Okay. And then — and then is there anything between there and the time that the — this crossing of the fog line was observed? No, Your Honor. At the point of the seeing of the peering around, Officer Bundy testified at the evidentiary hearing, and this is Clerk's Record 42 at 12, that he was possibly looking out for me, which raised my suspicion that something was going on. Could he have stopped him for that? Could he have stopped him right there? I don't know if — Suspicious peering at a law enforcement officer? Coupled with the getting off the road? I don't think so. Okay. So then is it the crossing the fog line that makes it suspicious? The swerving into the fog line, coupled with the two prior observations, filtered through the lens of the officer's experience. So the difficulty I have is that I can imagine driving down the road, and if I saw an officer pull a U-turn and start following me, I might look in the rearview mirror, too. That doesn't seem all that unusual to me. But at this point in the action, the police officer's testimony is at that point he thought, now his suspicion is DUI. And that's why it feels like a moving target to me. I would respectfully disagree with Your Honor's characterization and respectfully suggest that what might be going on here is the precise sort of divide-and-conquer analysis that the Supreme Court in Arvizu condemned. No, no. I preface my question by saying I appreciate this is the totality of the circumstances, but I feel that the officer, the record shows that he's articulating different reasons. And that might be, it may be that he had increasing suspicion and increasing suspicion of different activity, but I am trying to nail down what the record really shows. The the the I, for fear of perhaps mischaracterizing the record, I will let the record speak for itself on that point. But it appears clear to me from a fair reading of the record that the officer believed he might be intoxicated, he might have contraband in the car. He simply wasn't sure, and he was simply investigating further. Now, whether the mere peering around would have satisfied the constitutional threshold, that seems a little bit light. I would tend to doubt that. But then ---- It seems like you're treating this as if the defendant was always a pedestrian. A law enforcement officer can walk up to anybody who's behaving suspiciously and through guile or otherwise prolong the encounter in order to investigate her suspicions without having to specify what particular offense or ordinance or regulatory requirement is under investigation. But to stop a car because you think something might be up, strikes me as going a little beyond even Wren. Because if you can stop a car because before the people got in the car they acted suspiciously, then I'm not even sure you need Wren. And Wren is about as far as the Supreme Court has gone in this. We all commit traffic violations. And so I'm having difficulty putting all of this together. And that is ---- I understand what Your Honor is grappling with. I would merely urge Your Honor again to consider the totality of what was known to the officer at the moment he snapped on the lights. If he merely saw a driver swerve into the fog line three times in a quarter mile whether or not, and he'd seen nothing else, that may or may not, setting aside the does it violate Nevada revised statutes traffic law, that may or may not be enough to satisfy the constitutional minimum. I would respectfully suggest that on this record, after the exhaustive two-day hearing, the magistrate's finding and the district court's adoption of those findings, that it does. Let me ask you this. We've been dancing around Wren, and you just said, well, setting aside whether or not that violates a statute to touch the fog line, are you arguing that it does violate any Nevada traffic statute to touch the fog line three times in a quarter mile? No, Your Honor. I'm not arguing that. So this is not a simple Wren stop. That is correct, Your Honor. So there's no basis in Wren to justify this stop. Your Honor is correct. Okay. Got it. But the fog line may be relevant in the sense of he says, well, he couldn't quite manage to drive straight as he looked at me in the mirror, which strikes me as odd, or perhaps more plausibly, he's intoxicated and he can't drive straight. That strikes me as least possible. Now, is it a sufficient basis for the stop for Officer Bundy to think that he's drunk based on what he saw? Yes, it is. Not that he's engaged in some independent criminal activity with credit cards or transporting drugs. No, that he's just intoxicated. I see my light is on. Go ahead. Yes, Your Honor. If, based on the totality of the circumstances and the swerving into the fog line, three times led the officer to believe he might be intoxicated, that would suffice. And do we have testimony from the officer that that was one of the basis upon which he'd perform the stop? Yes, Your Honor. I think it's at SCR 5-6. Your Honor is correct. Counsel, so just to be clear, you said when you answered Judge Fletcher's question, you said based on the totality of the circumstances. But I appreciate that that's a test, but my hypothetical is, just to be clear about your response to the question, if nothing else had happened and this police officer had just driven up upon this defendant or your client and his client and had seen just the touching of the fog line, would that have been enough to stop based on DUI? If you just take that last third of the action? I don't know, Your Honor. I would tend to think the answer is no. Just seeing them touch the fog line is not enough? Just seeing a touching the fog line where it's clear that going over the fog line is like running a red light or blowing a stop sign, that would work. Now you've confused me, because I understood that that was the basis for the officer to think he was DUI. But you think that's not enough? I believe, Your Honor, that the totality of the circumstances, sorry to keep harping on that. That's okay. Is what furnished the officer with a reasonable suspicion that some criminal activity was afoot. Now, one of the officer's suspicions, based on that totality of the circumstances and amplified and reinforced by touching the fog line, was that he might be intoxicated. But the officer also harbored a suspicion that they're ultimately proven correct, although that's constitutionally irrelevant, that there might be contraband in the car. Okay. But just to answer the question, and then I'll let you go. But if he had just seen this individual touch the fog line three times, you think that would not have been enough? I would tend to think no. Thank you. I would think if he went over the fog line, yes. Okay. Thank you very much. Why don't we, the government went over a little. Why don't we put two minutes on the clock for you? Thank you. Your Honor, I would just like to make two points to follow up on some things that came up during the government's argument. First, mainly focusing on the fog line situation. Officer Bundy gives two reasons for why driving onto the fog line possibly gave him suspicion. One was that he thought. I gave you two minutes so you can slow down a little bit. I'm sorry. He testified that the reason he thought driving on the white line was suspicious is that it was possible Mr. Relianu was looking in the rearview mirror. But at this point, Mr. Relianu has seen this police officer three times. He saw him once drive past the gas station, once while he was on the building's corner, and then once again when he's on the highway. And this court in a number of cases has recognized that reacting to police officers on the road is not in itself suspicious because even normal people will see a police officer and address their driving behavior accordingly. As to whether this driving on the white line served as a basis to support a possible DUI, Officer Bundy had already observed Mr. Relianu drive out of the gas station, pull a perfectly legal U-turn, drive about less than a mile, according to the testimony, from that traffic light to the on-ramp, and then about a quarter of a mile. And all he observed was the slight touching of the white line three times. And unless there are further questions, I'll rest on that. Okay. Thank you very much. Thank both sides for useful arguments. The United States v. Relianu submitted for decision for the reasons I announced at the outset were putting Hornbuckle to the end of the calendar. The next case on the argument calendar this morning, Carlson v. Century Security Company.
judges: Davis, Fletcher, Christen